# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **Craig D. Scott, Trustee of** | : | |
| **The Craig D. Scott Revocable Trust**, | : | |
| 9679 Brock Road | : | |
| Plain City, OH 43064, | : | **Case No.** _____ |
| | : | |
| **Jerry L. Scott, Co-Trustee of** | : | |
| **The Jerry Lynn Scott Trust**, | : | **Judge** _____ |
| 9585 Brock Road | : | |
| Plain City, OH 43064, | : | |
| | : | |
| **Judith E. Scott, Co-Trustee of** | : | **JURY DEMAND ENDORSED HEREON** |
| **The Jerry Lynn Scott Trust**, | : | |
| 9585 Brock Road | : | |
| Plain City, OH 43064, | : | |
| | : | |
| **Phillip E. Scott, Co-Trustee of** | : | |
| **The Scott Family Living Trust** | : | |
| **U/A/D 09/25/2014**, | : | |
| 9521 Brock Road | : | |
| Plain City, OH 43064, | : | |
| | : | |
| **Mary Susan Scott, Co-Trustee of** | : | |
| **The Scott Family Living Trust** | : | |
| **U/A/D 09/25/2014**, | : | |
| 9521 Brock Road | : | |
| Plain City, OH 43064, | : | |
| | : | |
| **Paul C. Haueisen**, | : | |
| 10680 Crottinger Road | : | |
| Plain City, OH 43064, | : | |
| | : | |
| **T-Bill Development Co., LLC**, | : | |
| P.O. Box 165 | : | |
| Dublin, OH 43017, | : | |
| | : | |
| **Pulte Homes of Ohio LLC**, | : | |
| 475 Metro Place South, Suite 200 | : | |
| Dublin, OH 43017, | : | |
| | : | |
| **The Paragon Building Group, Ltd.**, | : | |
| 485 Metro Place South, Suite 350 | : | |
| Dublin, OH 43017, | : | |

| | |
|---|---|
| **Walbonns LLC**, | : |
| 425 Metro Place N. | : |
| Dublin, Ohio 43017, | : |
| | : |
| **Wicked Chicken, LLC**, | : |
| 12877 Darby Creek Rd. | : |
| Orient, OH 43146, | : |
| | : |
| *Plaintiffs*, | : |
| | : |
| v. | : |
| | : |
| **Jerome Township, Ohio**, | : |
| 9777 Industrial Parkway | : |
| Plain City, OH 43064, | : |
| | : |
| *Defendant*. | : |

## COMPLAINT FOR DECLARATORY JUDGMENT, PERMANENT INJUNCTION, AND COMPENSATORY DAMAGES

Plaintiffs Craig D. Scott, Trustee of The Craig D. Scott Revocable Trust, Jerry L. Scott, Co-Trustee of The Jerry Lynn Scott Trust, Judith E. Scott, Co-Trustee of the Jerry Lynn Scott Trust, Phillip E. Scott, Co-Trustee of The Scott Family Living Trust U/A/D 09/25/2014, and Mary Susan Scott, Co-Trustee of The Scott Family Living Trust U/A/D 09/25/2014, (collectively, the "Scott Family"), Paul C. Haueisen ("Mr. Haueisen"), T-Bill Development Co., LLC ("T-Bill"), Pulte Homes of Ohio LLC ("Pulte"), The Paragon Building Group, Ltd. ("Paragon"), Walbonns LLC ("Walbonns"), and Wicked Chicken, LLC ("Wicked Chicken") (all together, "Plaintiffs"), by and through their undersigned counsel, and for their Complaint for Declaratory Judgment, Permanent Injunction, and Compensatory Damages against Defendant Jerome Township, Ohio ("Jerome Township" or "Township") aver and allege as follows:

## INTRODUCTION

1.      Zoning in Jerome Township is broken.  A few organized and vocal individuals in the Township have hijacked the zoning process to stop new homes from being built purportedly to

keep the Township "rural." In reality, they want to keep *everyone else's* undeveloped land in the Township as greenspace. This "status quo" zoning is completely arbitrary, capricious, and illegal.

2. Private property rights are inviolate under the Ohio Constitution. Ohio townships are creatures of statute and have a very narrow and limited authority to restrict the use of private property through zoning – namely, where the zoning restriction is both "in the interest of public health and safety" and "in accordance with [the township's] comprehensive plan." OHIO REV. CODE § 519.02.

3. Jerome Township is located between the burgeoning cities of Dublin and Marysville, and the Village of Plain City, along the U.S. 33 and 42 corridors. These areas, like nearly every other Central Ohio community, have experienced substantial population growth over the last several decades.

4. The Township's Comprehensive Plan recognizes that in light of this growth, rural farming operations are no longer suitable in the majority of the Township given farming's incompatibility with residential communities due to "the noise of all night farming operations, potential odors and traffic conflicts with slower moving farming equipment." Comprehensive Plan p. 6-4. The Comprehensive Plan also recognizes that farming and rural residential zoning is not appropriate in areas where centralized sewer and water are available. *Id.*

5. Indeed, beyond providing additional housing necessary to address the current housing shortage in Central Ohio, planned development districts provide critical benefits to the public health and safety in the Township that are infeasible in sparse, rural areas. For example, unlike rural residential areas, planned development districts provide centralized sanitary sewer service, centralized stormwater management, planned tree and open space preservation, and traffic access and associated safety controls.

-3-

6. The Township's Comprehensive Plan therefore calls for the clustering of new homes in planned, residential communities in certain areas throughout the Township, including Plaintiffs' properties. The Comprehensive Plan specifically highlights Jerome Village – a development approved before these individuals held all undeveloped land in the Township hostage – as a model of one such community. Jerome Village balances the Township's desperate need for housing with the desire to preserve natural features and open space.

7. Recently, however, the Township has arbitrarily abandoned its Comprehensive Plan. A few individuals have developed an end-run around the Comprehensive Plan's provisions by misusing the referendum process. Over the last several years, these individuals have attempted to put new residential developments to a referendum no matter how large or small the development. Each time, they have instituted the referendum process without regard to the developments' compliance with the Township's Comprehensive Plan and in the absence of any evidence that these developments could somehow be unhealthy or unsafe.

8. The scheme is simple. As soon as a residential development's zoning is approved by the Township's Trustees, a referendum petition is circulated among members of an email list. An arbitrary and capricious smear campaign ensues. Rather than consider whether the development's zoning complies with the Comprehensive Plan, the focus is instead placed on impermissible subjects such as the "type of development" and "kind of clientele" the new community might bring to the Township. Each referendum sought to permanently relegate the undeveloped farmland to open space at the expense of the landowners' and developers' property rights. That is exactly what happened here, three times over.

9. First, the Scott Family, who have farmed their property for over 80 years, contracted to sell their farmland for development in order to pay off staggering medical bills for a

family member. In turn, the developers, T-Bill and Pulte, rezoned the property to develop a new residential subdivision called the Homestead at Scotts Farms. This new community fully complied with the Township's Comprehensive Plan. This was no accident. The professional land planner responsible for creating the Township's Comprehensive Plan was retained by the developers to plan and design the Homestead at Scotts Farm. Not surprisingly, the development was unanimously approved by every single governmental body that reviewed it. Nevertheless, the anti-development group claimed that the homes in the Homestead at Scotts Farm would somehow "denigrate the character of the neighborhood." This group then instituted a referendum on the rezoning to delay and ultimately block the Homestead at Scotts Farm altogether. The delay alone has financially devastated the Scott Family.

10. Second, Paragon contracted to purchase more than 210 acres of land to build a residential subdivision called Rolling Meadows. Again, Paragon ensured that Rolling Meadows complied with every aspect of the Comprehensive Plan to develop a residential subdivision with workforce housing and obtained Township approval for the development. Nevertheless, this vocal minority of individuals sought to exclude Rolling Meadows from the community. They claimed that Rolling Meadows did not bring the "type of development" or "value" they fancied. As a result, they misused the referendum procedure to arbitrarily reverse the rezoning and restore the property's outdated Rural Residential zoning.

11. Third, Tom Caldwell, the owner of a small area of land in Jerome Township, planned to retire after developing his property into a quaint residential community known as the Farm at Indian Run. Mr. Caldwell also retained the professional land planner who was responsible for creating the Township's Comprehensive Plan. The Farm at Indian Run was intentionally designed to comply with the Comprehensive Plan in every respect. While Mr. Caldwell obtained

approval to rezone his property from the Township, the referendum process was misused to re-impose the Rural Residential zoning on Mr. Caldwell's property.  Within days of the referendum, once Mr. Caldwell could no longer put his land to any viable use, one of the referendum leaders sought to obtain a third of Mr. Caldwell's property for the leader's own use.

12.     In each case, Plaintiffs went above and beyond what the law required for each of their developments.  Each developer expended significant sums over months and months of careful planning and designing to meet and exceed the standards prescribed by the Township's Comprehensive Plan and Zoning Resolution.  Yet, the illegal status quo and exclusionary zoning tactics applied in each case disregarded Ohio zoning law and trampled upon Plaintiffs' private property rights protected by the United States and Ohio Constitutions.

13.     It is well established that the Township is legally responsible for the deprivation of Plaintiffs' constitutional rights whether the deprivation occurs "by referendum or otherwise." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 105 S. Ct. 3249, 3259 (1985).  The Township's illegal and unconstitutional scheme has caused – and will cause – Plaintiffs millions of dollars in damages.  Plaintiffs therefore seek injunctive, monetary, and declaratory relief for the violation of the United States and Ohio Constitutions and violation of Ohio zoning law.

## JURISDICTION AND VENUE

14.     This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

15.     Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), 28 U.S.C. § 1367, and 28 U.S.C. § 2201.  Jurisdiction supporting Plaintiffs' claims for attorneys' fees is conferred by 42 U.S.C. § 1988.

16.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) as this is the judicial

district in which a substantial part of the events or omissions giving rise to the claim occurred.

## PARTIES

17.     Craig D. Scott is a resident of Jerome Township and the trustee of the Craig D. Scott Revocable Trust.  The Craig D. Scott Revocable Trust owns a parcel of real property containing approximately 66.928 acres of land located on Brock Road, Plain City, Ohio 43064 in Jerome Township, Ohio, with Parcel Number 1700110292000.  Only approximately 8.99 acres of which are a part of the Homestead at Scotts Farm.

18.     Jerry L. Scott and Judith E. Scott are residents of Jerome Township and co-trustees of the Jerry Lynn Scott Trust.  The Jerry Lynn Scott Trust owns a parcel of real property containing approximately 63.463 acres of land located at 9585 Brock Road, Plain City, Ohio 43064 in Jerome Township, Ohio, with Parcel Number 1700110293000.

19.     Phillip E. Scott and Mary Susan Scott are residents of Jerome Township and co-trustees of the Scott Family Living Trust dated September 25, 2014.  The Scott Family Living Trust owns a parcel of real property, containing approximately 66.928 acres of land located at 9521 Brock Road, Plain City, Ohio 43064 in Jerome Township, Ohio, with Parcel Number 1700110291000.

20.     Paul C. Haueisen owns a parcel of real property containing approximately 34 acres of land located at 10680 Crottinger Road, Plain City, Ohio 43064 in Jerome Township, Ohio, along Crottinger Road and Industrial Parkway, with Parcel Number 1500040180000.

21.     T-Bill Development Co., LLC is a limited liability company organized under the laws of the State of Ohio.  T-Bill has contracted to purchase real property from the Scott Family, located on the south side of Brock Rd, east of the U.S. 33 overpass, including Parcel Numbers 1700110293000 and 1700110291000, and a portion of Parcel Numbers 1700110292000.

22. Pulte Homes of Ohio LLC is a limited liability company organized under the laws of the State of Michigan. Pulte and T-Bill have contracted to assign T-Bill's rights, duties, and obligations as Buyer of the Homestead at Scotts Farm to Pulte.

23. The Paragon Building Group, Ltd. is a limited liability company organized under the laws of the State of Ohio. Paragon contracted to purchase approximately 210.62 acres of land located along Industrial Parkway and Crottinger Road, including Parcel Numbers 1500040180000, 1400050060000, 1400050070000, 1500040184000, 150004018100, 1500040183000, 1400050030000, and 15000400440000.

24. Walbonns LLC is a limited liability company organized under the laws of the State of Ohio. Walbonns is the owner of parcels of real property, containing approximately 89.24 acres located at 10897 Industrial Parkway, Marysville, Ohio 43040 in Jerome Township, Ohio along Industrial Parkway, with Parcel Numbers 1400050060000 and 1400050070000.

25. Wicked Chicken, LLC is a limited liability company organized under the laws of the State of Ohio. Wicked Chicken is the owner of real property located east of the intersection of McKitrick Road and Mitchell-Dewitt Road in Jerome Township, Ohio including Parcel Numbers 1700260250000, 1700260241000, and 1700260240000.

26. Jerome Township, Ohio is a township located in Union County, Ohio.

27. In addition to the foregoing parties, the Attorney General of the State of Ohio is being served with a copy of this complaint pursuant to OHIO REV. CODE § 2721.12(A).

## FACTS COMMON TO ALL CLAIMS

### A. Ohio Townships and Their Residents Have Very Limited Authority to Zone Property.

28. The right to use and enjoy private property is fundamental in Ohio. "[T]he founders of [Ohio] expressly incorporated individual property rights into the Ohio Constitution in terms that

reinforced the sacrosanct nature of the individual's 'inalienable' property rights, which are to be held forever 'inviolate.'" *City of Norwood v. Horney*, 110 Ohio St. 3d 353, 363 (Ohio 2006) (quoting Ohio Constitution Section 1, Article I and Section 19, Article I, respectively).

29. Indeed, "[t]here can be no doubt that **the bundle of venerable rights associated with property is strongly protected in the Ohio Constitution and must be trod upon lightly, no matter how great the weight of other forces**." *Id.* (emphasis added).

30. Ohio townships have no inherent or constitutionally granted power to zone property. *Bd. of Twp. Trs. of Bainbridge Twp. v. Funtime, Inc.*, 55 Ohio St.3d 106, 108 (Ohio 1990).

31. Rather, Ohio townships' authority to zone property is determined by the General Assembly. *Id.* ("Whatever police or zoning power townships of Ohio have is that delegated by the General Assembly, and it follows that such power is limited to that which is expressly delegated to them by statute.").

32. The General Assembly expressly limits townships' power to adopt zoning regulations only to the extent the zoning regulations are "in the interest of the public health and safety" and "in accordance with a comprehensive plan." OHIO REV. CODE § 519.02.

33. Consequently, Ohio Township zoning actions that exceed this limited authority are void as a matter of law. *See Columbus Bituminous Concrete Corp. v. Harrison Twp. Bd. of Zoning Appeals*, 160 Ohio St.3d 279, 156 N.E.3d 841 (Ohio 2020).

34. Likewise, Township residents' opportunity to participate in the legislative process of township zoning through referendum arises from the Ohio Revised Code. *Cook-Johnson Realty Co. v. Bertolini*, 15 Ohio St. 2d 195, 239 N.E.2d 80 (1968). Ohio township residents have no inherent or constitutional right to zone property through referendum. *Id.*

35.     Regardless of whether township zoning actions occur through township trustees or through a referendum, the "legislative acts by the people are to be controlled and construed by the same principles as are applied to legislative acts" of the government.  *Trafalgar Corp. v. Bd. of Miami Cty. Comm'rs*, Case No. 2001 CA 6, 2001 Ohio App. LEXIS 3946, at \*5-6 (2d Dist. Sep. 7, 2001).  Just like township officials, township residents can therefore only impose zoning restrictions on private property to the limited extent the restrictions are "in the interest of the public health and safety" and "in accordance with a comprehensive plan."

36.     "A referendum . . . is the [government] itself legislating through its voters" such that the Township is responsible for the referendum result.  *See Eastlake v. Forest City Enters., Inc.*, 426 U.S. 668, 678, 96 S. Ct. 2358 (1976); *Lucas v. Forty-Fourth Gen. Assembly*, 377 U.S. 713, 737, 84 S. Ct. 1459, 1474 (1964) (One's "constitutional rights can hardly be infringed simply because a majority of the people choose that it be."); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 448, 105 S. Ct. 3259.

37.     Consequently, a referendum does not inoculate the result from review and invalidation simply because an election was conducted.  *See Visconsi-Royalton, Ltd. v. City of Strongsville*, 8th Dist. Cuyahoga, No. 83128 2004-Ohio-4908, ¶ 24.  ("[A] zoning ordinance upheld by referendum is subject to the same constitutional test as an ordinance enacted by a municipality.").  Public participation in land-use decision making is circumscribed by the same procedural and substantive safeguards against capricious and arbitrary actions by township officials.  *Eastlake v. Forest City Enters.*, 426 U.S. 676, 96 S. Ct. 2363.

38.     Indeed, the United States Supreme Court has long held that "[i]f the substantive result of [a] referendum is arbitrary and capricious, bearing no relation to the police power, then the fact that the voters . . . wish it so would not save the restriction."  *Id.*

**B.      Jerome Township Adopts a Zoning Resolution and Comprehensive Plan.**

39.      Jerome Township originally adopted the Jerome Township Zoning Resolution (the "Zoning Resolution") in the mid-1950s.

40.      In relevant part, the Township amended the Zoning Resolution extensively in the early 1970s and again in 2015.

41.      The Zoning Resolution includes numerous zoning districts, including the Agricultural District, Rural Residential District ("Rural Residential"), Low Density Residential District, Medium Density Residential District, Office/Research/Medical District, Commerce District, Local Retail District, Regional Retail District, Special Recreation District, Planned Development District, and Open Space District.

42.      The Jerome Township Board of Trustees (the "Trustees") also adopted the Jerome Township Comprehensive Plan (the "Comprehensive Plan"), which was designed to guide the process of growth and development in the Township.  As set forth in the Comprehensive Plan, it took nearly a full year to develop and approve the Comprehensive Plan.  Comprehensive Plan p. 1-5.  The Plan was the product of "an extensive research and analysis process, community engagement, goal setting and land use decision initiatives."  *Id.*  There were numerous public meetings in which the public's input was captured and utilized to frame the Comprehensive Plan. Members of the Township's Board of Trustees, its Zoning Board and professional zoning staff, as well as independent land planning experts developed the Comprehensive Plan.  *Id.* p. 1-4.

43.      The Comprehensive Plan correctly anticipates the rapid population growth of the U.S. 33 Northwest Corridor.   Moreover, the Comprehensive Plan recognizes that Jerome Township "is in a position to benefit from new development" while also preserving "the rural character of Jerome Township."

44.      As such, the Comprehensive Plan promotes developments that cluster housing in

order to preserve "large land areas and rural character." The Comprehensive Plan also promotes developments that provide "a variety of lots sizes and housing types" in order to offer housing amenable to families with children and affordable enough for many people.

     **C.**    **Until Recently, Jerome Township Regularly Rezoned Properties from Rural Residential to Planned Development District.**

45.    In 2008, approximately 75% of the land in Jerome Township was considered agricultural, but only 0.4% of the residents were farmers. Comprehensive Plan p. 5-3. The vast majority of the land was undeveloped and zoned "Rural Residential" by default.

46.    The Rural Residential zoning district is a vestige of Jerome Township's rural heritage. Properties under this zoning classification are required to have a minimum 1.5 acre lot with at least 150 feet of frontage for each home and sufficient land to accommodate well and septic systems for on-site water and sanitary systems. Zoning Resolution § 425.04. The Zoning Resolution, however, explains that Rural Residential is intended "for land which is suitable or used for very low density residences **as defined in the Comprehensive Plan**." *Id.* § 425.001 (emphasis added).

47.    Like many townships in Central Ohio, Jerome Township has experienced significant population growth over the last ten years.

48.    Thus, while most, if not all of Jerome Township's residential land was originally zoned Rural Residential, Jerome Township rezoned numerous properties from Rural Residential to the Planned Development District and other zoning districts.

49.    Recognizing the need for development of these agricultural and rural areas, the Comprehensive Plan states that only 28.7% of the Township should remain Agricultural or Rural Residential. Comprehensive Plan p. 6-3. The land designated Agricultural/Rural Residential in the Comprehensive Plan is on the far western side of the Township and is nowhere near any of

Plaintiffs' properties.  *Id.* p. 6-4.

50.     Jerome Township previously rezoned numerous properties from Rural Residential to Planned Development District, such as developments now known as Glacier Pointe, Mitchell Crossing, New California Hills, New California Woods, and the Woods at Labrador.

51.     In fact, Jerome Township even approved rezonings from Rural Residential to Planned Development District when the accompanying development deviated significantly from the Comprehensive Plan.  The Woodbine Village development, approved by Jerome Township before 2015, is one such example.

**D.     Recently, a Vocal Minority of Individuals Began to Misuse the Referendum Process to Delay and Block *Any* Residential Development in the Township.**

52.     Recently, a vocal minority of individuals developed a scheme to stop *any* further residential development in Jerome Township – a tactic known as "status quo" zoning.

53.     Under a "status quo" zoning scheme, no growth is misconstrued as good growth. The existing residents bar the doors to any new development and, in turn, any new residents.

54.     "Status quo" zoning is inherently exclusionary, arbitrary, capricious, and illegal.  It results in economic segregation rather than the promotion of the health and safety of the community.  By prohibiting new development and preventing new residents from moving into the area, persons of certain economic status are excluded from the community under the guise of zoning regulations.  Status quo zoning is also rejected by and not in accordance with the Comprehensive Plan.

55.     A group of individuals in the Township arbitrarily decided that the undeveloped property within the Township should remain rural, untouched, green space.

56.      These individuals are opposed to *any* new residential development or new citizens that deviate from the status quo.

57.    These individuals capriciously claim that new residential development and, in turn, new residents, will somehow degrade the Township.

58.    These individuals arbitrarily inflate their own property values for their own personal benefit by imposing a unilateral and arbitrary ceiling on the supply of housing and forcing any undeveloped properties to remain undeveloped while the demand for housing continues to outpace the housing supply.

59.    There is a significant demand for new housing in Jerome Township. The Building Industry Association of Central Ohio recently determined that there is a substantial shortage of residential homes in Central Ohio needed to meet projected population and job growth in this area. Just this year, the U.S. housing market has a shortage of 5.5 million homes to meet demand. In Central Ohio, the availability of housing reached an all-time low despite high demand from homebuyers. Plaintiffs' planned developments will increase the number of new homes to help satisfy that unmet demand while staying within the Township Zoning Resolution's density requirements for Planned Districts and compliance with the Township's Comprehensive Plan.

60.    Yet, these individuals contend, falsely, that additional residential development will somehow transform Jerome Township into an "urban" area. None of these residential communities involve high-rises or anything remotely resembling an urban setting. This is the epitome of exclusionary "status quo" zoning.

61.    Under their scheme, these individuals misuse the referendum process to prevent new residential development from occurring in the Township regardless of whether the residential development satisfies the Zoning Resolution and Comprehensive Plan.

62.    There have recently been several residential developments where Rural Residential land was sought to be rezoned to Planned Development District. Each of these developments

-14-

satisfied the Township's Zoning Resolution and Comprehensive Plan.  The Township had no discretion to deny the rezonings.  Consequently, and pursuant to the limits of their zoning authority, Township officials approved the rezonings.

63.    During the residential rezonings, these individuals seek to extort the landowners and/or developers through completely arbitrary demands well beyond what is or could be required by law.  For example, these individuals have demanded that the landowners/developers pay for public recreational facilities that have nothing to do with their developments, make random payments to the school district, fire department, police department, and EMS, and require that every new home in the development somehow be capable of supplying more than 50% of all energy necessary for the home through rooftop solar panels or some unspecified renewable energy regardless of whether such a requirement is even physically or economically possible.  None of these arbitrary demands have any basis in law.

64.    In each and every instance, this group of individuals initiated, or attempted to initiate, a referendum to block the rezoning and maintain the status quo.  The results of the referendum have become inevitable: each time the Comprehensive Plan is ignored, the status quo is illegally preserved, and no new residential development is allowed to occur.

65.    Indeed, despite the numerous residential rezonings that have been approved in Jerome Township by Township officials over the last several years, only one residential rezoning application, which was approved in March 2020, has been approved without a referendum attempt – an anomaly caused by the global pandemic's impact on door-to-door signature gathering.

66.    Consequently, in each instance, despite the owners' and developers' efforts and vast investments into the properties, studies, approvals, and applications, and despite their compliance with the Zoning Resolution and Comprehensive Plan, the status quo is preserved and

the land reverted back to the outdated, default Rural Residential zoning.

67.     Yet, in each such occasion where the rezoning complies with the Comprehensive Plan, the status quo zoning scheme exceeds the Township's limited zoning authority.

**E.     Jerome Township Has Prevented Plaintiffs from Putting Their Properties to Any Economically Beneficial Use.**

68.     Through an arbitrary, capricious, unreasonable, and unconstitutional scheme, Jerome Township misused the referendum process to delay and ultimately block Plaintiffs from developing three residential communities known as: (1) The Homestead at Scotts Farm, (2) Rolling Meadows, and (3) The Farm at Indian Run.  As set forth below, each of these communities fully comply with the Comprehensive Plan and benefit the public's health and safety.

**1.     The Homestead at Scotts Farm**

69.      Despite it fully complying with the Comprehensive Plan and Zoning Resolution, Township residents abused the referendum process to stop development of the Homestead at Scotts Farm for illegitimate reasons.

**a.     Facing an Unprofitable Farm and Financial Difficulties Due to Staggering Medical Bills, the Scott Family Contracts to Sell Their Farm.**

70.     The Scott Family has lived in Jerome Township for generations.  The Scott Family farm (the "Scott Property") is zoned Rural Residential and was historically used for farming.

71.     The Scott Family began farming their property in or around the 1940s.  The Scott Family originally operated a turkey farm, raised hogs, cattle, and sheep, and grew alfalfa hay on their land.

72.     Decades later, however, farming the Scott Property has become increasingly difficult.  The Scott Property is nearly surrounded by other planned residential subdivisions, making it infeasible to operate an animal farm or grow crops at the scale necessary to be

economically viable given the odors, runoff, and safety issues involved in such farming operations and the close proximity of the residential subdivisions at Glacier Pointe and Woodbine Village:



73.     Indeed, it is no longer feasible to farm the Scott Property. While the Scott Family now leases the property to other farmers for a negligible rental rate, the farm rent barely covers the property taxes.

74.     The eldest living Scott family members, retired Worthington school teachers, still live on the Scott Property. The patriarch of the Scott Family suffers from a progressive form of dementia, and the Scott Family has struggled to provide him with adequate home care.

75.     Facing economic anxiety and their changed circumstances, the Scott Family made the difficult decision to sell the family farm, except for a few acres containing their homes, in order to pay the substantial medical bills and provide other family members with a retirement income.

76.     The Scott Family contracted to sell their property to T-Bill. The land purchase is contingent upon T-Bill's ability to obtain a rezoning of the Scott Family property from Rural Residential to Planned Development District.

77.     T-Bill subsequently assigned the majority of its interests in the Scott Property to

Pulte. The assignments are likewise contingent upon rezoning the Scott Property to Planned Development District.

> **b. The Homestead at Scotts Farm Fully Complies with the Comprehensive Plan and Zoning Resolution in All Material Respects.**

78. Consistent with the Comprehensive Plan, T-Bill applied to rezone the Scott Property to Planned Development District in order to build the Homestead at Scotts Farm:



79. The Homestead at Scotts Farm consists of single-family homes situated and designed in a manner that complies with the Comprehensive Plan. A true and accurate copy of the Illustrative Design of the Homestead at Scotts Farm is attached as Exhibit 1.

80. Throughout the rezoning, the evidence established that the Homestead at Scotts Farm is entirely consistent with the Comprehensive Plan and the Zoning Resolution.

81. In fact, The Homestead at Scotts Farm was planned and designed by Gary Smith, an expert land planner who previously worked as the professional land planner and project manager for the creation of the Township's Comprehensive Plan. Thus, remaining harmonious with the Comprehensive Plan was intentional.

82. The Scott Property is designated in the Comprehensive Plan as Residential

Conservation District.

83.    As set forth in the Comprehensive Plan, communities within a residential conservation district are planned unit developments that cluster homes on smaller lots to preserve large areas of open space. Comprehensive Plan pp. 6-8 through 6-9. The amount of open space provided in a residential conservation district should not be less than 40% of the gross acreage of the property being developed with a maximum density of two dwellings per acre. *Id.*

84.    The Homestead at Scotts Farm is precisely what the Comprehensive Plan envisions for the Scott Property. The homes are strategically located to maximize open space, while preserving several of the natural features of the Scott Property. The community will have 44% open space and a density well short of the maximum permitted, at only 1.79 homes per acre.

85.    A larger development, Glacier Pointe, is adjacent to the Homestead at Scotts Farm. Glacier Pointe has a nearly identical density of 1.78 homes per acre and was fully approved.

### c.   It Is Infeasible to Develop the Scott Property Under the Outdated Rural Residential Zoning Restrictions.

86.    Not only is farming the Scott Property practically and economically infeasible, it is also economically infeasible to develop the Scott Property under the Rural Residential zoning restrictions for several reasons.

87.    First, there is insufficient access to develop the vast majority of the Scott Property. There are only three possible access points to Brock Road from the Scott Property, if developed separately. Given the minimum 1.5 acre lot size restriction on properties zoned Rural Residential, only a few homes could be built on the Scott Property with direct access to Brock Road. The overwhelming majority of the rest of the Scott Property would be landlocked.

88.    Second, and related to the lack of access, it would be economically infeasible to build a road along with the requisite roadway, stormwater, retention basins, water, and sewer

infrastructure to service the few homes that could be built on the entirety of the Scott Property that is not directly on Brock Road.  It would therefore be unreasonable and unsafe to the community to force the development of the Scott Property without sufficient roadway, stormwater, water, and sewer infrastructure.  Among other things, the lack of such necessary infrastructure would be harmful to the environment, increase the risk of flooding for the area, and would diminish the aesthetics of the community.

89.     Third, the development of the entirety of the Scott Property as Rural Residential would proceed piecemeal in a completely random fashion without any of the benefits of a planned residential community which must be built consistent with the community's development plan text requirements and deed restrictions.  These requirements and restrictions ensure that the land is developed consistent with the Comprehensive Plan.  For example, the Homestead at Scotts Farm must be constructed to satisfy minimum square footage requirements for homes, use high quality exterior materials, include trees along the community's streets, abide by minimum landscaping requirements, and ensure that structures have compatible exterior designs and colors.  Moreover, the Homestead at Scotts Farm will have a homeowners association to maintain various facilities and amenities in the community that benefit all of the homeowners and that will administer and enforce the provisions of the deed restrictions.

90.     Finally, because of the lack of access, and the inability to farm the Scott Property, the reality is that well over 100 acres of land could be unused, fallow ground.

91.     In contrast, by developing the Scott Property as a planned development, consistent with the Comprehensive Plan, all of these issues are easily addressed.  A planned subdivision provides better and safe roadway access to each and every home.  The economies of scale permit appropriate roadway, stormwater, water, and sanitary sewer infrastructure to be built.  It also

permits the construction of strategically located retention ponds to mitigate flood concerns. All of this directly benefits the health and safety of the Township and its residents. None of this is possible through random, individualized, piecemeal home building.

### d. The Homestead at Scotts Farm Receives Unanimous Approval.

92. Every single government body that reviewed The Homestead at Scotts Farm unanimously recommended or approved it.

93. In fact, the developers provided the conceptual plan to the neighbors and had conference calls to obtain the neighbors input *before* filing the application for zoning. After the neighbors expressed strong concerns about the location of the main entrance, the developers delayed submission of their application to see if it was possible to obtain land for the neighbors' preferred entrance. The developers were successful in contracting to purchase the additional land, revised their development plan to incorporate neighbors' preferred main entrance, and proceeded with submitting the application after a 30-day delay and acquisition of additional land at a cost of over $500,000.

94. In February 2021, the Logan-Union-Champaign Regional Planning Zoning & Subdivision Committee ("LUC Zoning & Subdivision Committee") reviewed the rezoning application and unanimously recommended approval, subject to a few modifications.

95. The rezoning application and development plans were revised accordingly.

96. In February and March 2021, the Township's Zoning Commission held public meetings on the rezoning application. The Zoning Commission voted unanimously to recommend approval of the proposed amendment with certain modifications.

97. The application and development plans were revised accordingly.

98. After the Zoning Commission's hearings, T-Bill then independently met with several of the Brock Road neighbors to hear their concerns, if any.

99. On April 20, 2021, the Township Trustees held a public hearing to consider T-Bill's rezoning application and revised development plan.

100. In response to feedback from the community and the Trustees, T-Bill made numerous changes to the Homestead at Scotts Farm, including but not limited to the following:

    a. T-Bill contracted to acquire an additional 9 acres of land at an added cost of approximately $500,000 to relocate the main entrance to the subdivision further west on Brock Road. This change was not required, but based entirely on the neighbors' requests.

    b. T-Bill committed to installing a right-hand turn lane at the Brock Road and Industrial Parkway Intersection at a cost of nearly $300,000, approximately seven times more than what would be required for T-Bill's proportional share of the total traffic generated from the Homestead at Scotts Farm.

    c. T-Bill committed to building a fence along the boundary of the adjacent properties to the east and agreed to increase the rear yard setback for certain structures to accommodate requests from neighboring residential properties.

    d. T-Bill committed to preserving 44% open space and planting 1,400-1,500 trees. In fact, the only trees being removed by this development are to accommodate the neighbors' request for a different main entrance.

    e. T-Bill committed to a $50,000 contribution to the Township for improvements to Harry Wolfe Park which is located near the development.

    f. T-Bill committed to connecting a path to the sidewalk system in the neighboring development, leading to Glacier Ridge Metro Park.

101. Several of the changes implemented to address the community's feedback are set

forth in red in the Homestead at Scotts Farm's Zoning Plan ("Zoning Plan"). A true and accurate copy of the Zoning Plan illustrating these changes is attached as Exhibit 2.

102. Each and every one of these changes were not necessary to satisfy the Comprehensive Plan, but were made to be good neighbors and to provide direct benefits to the Township and its residents that are far and above what is required to rezone the Scott Property.

103. Despite all of the community benefits that were added, one of the individuals opposed the development because the anticipated $500,000 homes in the Homestead at Scotts Farm would "**denigrate the character of the neighborhood**" and depress existing property values.

104. Nevertheless, Trustee Joe Craft praised T-Bill for being cooperative and making "every effort to communicate with neighbors."

105. Additionally, Trustee Megan Sloat recognized T-Bill's efforts to preserve natural features on the site, including nine acres of trees.

106. On May 5, 2021, the Trustees unanimously approved the Rezoning.

107. T-Bill and Pulte spent significant sums securing the land for the Homestead at Scotts Farm, planning and designing the development, and applying for and obtaining approvals from the Township's Zoning Commission, the LUC Zoning & Subdivision Committee, and the Township Trustees.

### e. The Vocal Minority of Individuals Arbitrarily Halt the Rezoning.

108. Despite full compliance with Zoning Resolution and Comprehensive Plan, certain individuals in the Township threatened T-Bill with a referendum in an effort to extort random payments for a community wishlist that have no basis in law and are unconstitutional exactions.

109. For example, one Township resident emailed T-Bill and threatened to subject the development to a referendum should T-Bill not "be open to further modifications" that go well

beyond what is required by the Zoning Resolution and Comprehensive Plan.

110.    Another Township resident emailed T-Bill and proclaimed that the development should "go beyond what is required, not just remediate the issues [the] development will cause, but actually make the township better. . . ."  The "issues" according to the resident, however, was to eliminate "more houses" and "more students."  In other words, to stop building houses and to leave the Scott Property fallow.

111.    T-Bill has made every feasible compromise, including agreeing to improvements and enhancements that are not required by the Zoning Resolution or the Comprehensive Plan.

112.    There is no basis under the Zoning Resolution or Comprehensive Plan to deny the rezoning.

113.    Nevertheless, to stop the building of these new half-million dollar homes that would purportedly "denigrate" the community, these individuals halted the development by seeking a referendum on the rezoning that has no legitimate basis.

114.    The continued imposition of the Rural Residential zoning onto the Scott Property is arbitrary, unreasonable, and does not bear a substantial relationship to the public health, safety, morals, or general welfare.  Nor is it consistent with the Comprehensive Plan, which designates the Scott Property as conservation development.

115.    The continued imposition of the outdated Rural Residential zoning and the delay caused by the sham referendum has resulted in and will continue to result in millions of dollars in damages to the Scott Family, T-Bill, and Pulte.

    **2.  Rolling Meadows**

116.    Despite Rolling Meadows full compliance with the Comprehensive Plan and Zoning Resolution, Township citizens abused the referendum process to arbitrarily stop the

Rolling Meadows development.

### a. Paragon Plans and Designs Rolling Meadows.

117.    Paragon entered contracts to purchase approximately 210.62 acres of land along Industrial Parkway and Crottinger Road (the "Paragon Property"). The Paragon Property is zoned Rural Residential and Special Recreation District:



118.    Paragon subsequently applied to rezone the Paragon Property to Planned Development District in order to build a residential development, Rolling Meadows:



A true and accurate copy of the illustrative design for Rolling Meadows is attached as Exhibit 3.

119. Rolling Meadows fully complies with the Comprehensive Plan and Zoning Resolution.

120. The Comprehensive Plan also calls for the Paragon Property to be in a residential conservation district. Consequently, the rezoning to a Planned District and development of Rolling Meadows satisfies the Comprehensive Plan. Rolling Meadows will provide 40% or more open space. It will also have far less homes than the maximum permitted under the Comprehensive Plan and Zoning Resolution, with only 1.79 homes per acre. Further, to preserve the 'rural character' of the area, Paragon agreed to a 200-foot setback along Industrial Parkway – a requirement that far exceeds setback requirements in the Comprehensive Plan and Zoning Resolution.

121. Throughout the zoning process, Paragon also made commitments to benefit the community beyond those required by the Comprehensive Plan or the Zoning Resolution. For example, Paragon agreed to plant over 1,000 trees in Rolling Meadows in order to alleviate any aesthetic or green space concerns.

### b. The Paragon Property Cannot Be Developed under Rural Residential Zoning Requirements.

122. Developing the Paragon Property under the Township's Rural Residential zoning restrictions is infeasible. It is also unreasonable, unsafe, and uneconomical.

123. The Paragon Property's topography presents unique challenges to its development. Large portions of the Paragon Property lie within a flood plain. Clustering of homes is necessary to avoid building in the flood plain, but is not possible under the Rural Residential zoning restrictions.

124. Moreover, the centralized stormwater management system necessary to manage flood events requires developments with a much higher density than permitted under the Rural

-26-

Residential zoning restrictions to be economically feasible.

125.    Further, developing the Paragon Property under the current zoning classification creates traffic safety issues due to the ingress and egress to the individual lots.  If the Paragon Property were developed under the Rural Residential zoning classification, it would require multiple separate additional driveways along Industrial Parkway.  Industrial Parkway is a busy thoroughfare, and additional driveways would create additional traffic safety issues were the Paragon Property developed as Rural Residential.

126.    Finally, it is uneconomical to develop the Paragon Property as Rural Residential.

127.    As recognized in the Township's own Comprehensive Plan, the Planned Development District zoning mitigates each of these issues.

128.    Rolling Meadows maximizes conservation of the Paragon Property's natural environment.  For example, Rolling Meadows is designed to preserve 40% of the Paragon Property as open space and natural features of the environment by clustering homes.  Rolling Meadows also requires large setbacks for each lot, which promotes preservation of natural features of the environment.  Therefore, rezoning the Paragon Property to Planned Development District would provide the environmental protection that is absent under the Rural Residential zoning.

129.    The design of Rolling Meadows minimizes traffic and safety concerns.  The large setbacks prevent homes from being built too close to busy roads and thoroughfares, which could pose safety issues and diminish the scenic byways of Jerome Township and Union County.  Additionally, there would only be two entrances to the Rolling Meadows subdivision: one from Industrial Parkway and one from Crottinger Road.  Thus, there would be no individual driveways connecting to Industrial Parkway or Crottinger Road.  Additionally, there would be left turn lanes added on Industrial Parkway and Crottinger Road, which safely address traffic on both roads from

the development.

130. Further, the creative and thoughtful design of Rolling Meadows ameliorates topographical issues caused by the floodplain. Rolling Meadows clusters housing so no houses lie within or near the floodplain and provides centralized stormwater, water, and sanitary sewer systems.

131. Finally, Rolling Meadows will increase the number of new homes to help satisfy the unmet housing demand in Jerome Township while staying within the Zoning Resolution's density requirements for Planned Development Districts.

**c. Rolling Meadows Is Approved By Every Zoning Authority.**

132. Recognizing that Rolling Meadows fully complies with the Comprehensive Plan and Zoning Resolution, every zoning authority approved the rezoning and development plan.

133. On February 14, 2019, the LUC Zoning & Subdivision Committee voted unanimously to recommend approval of Paragon's rezoning application and the Rolling Meadows development plan after a thorough review of the application and staff report.

134. The Township Zoning Commission voted unanimously to recommend approval of the Paragon rezoning application to the Trustees on March 25, 2019.

135. On July 2, 2019, the Trustees voted to rezone the Property to Planned Development District and approved Rolling Meadows. As a condition of the Trustees' approval, however, the Trustees imposed an illegal exaction, requiring Paragon to pay an arbitrary $500 per lot fee that is without basis in the Zoning Resolution or Comprehensive Plan.

136. Paragon spent significant sums securing the land for Rolling Meadows, planning and designing the development, and applying for and obtaining approvals from the Township's Zoning Commission, the LUC Zoning & Subdivision Committee, and the Township Trustees.

### d. A Vocal Minority of Individuals Obtained a Referendum for Illegitimate Reasons.

137. Despite Rolling Meadows compliance with the Comprehensive Plan and Zoning Resolution, a vocal minority of individuals opposed *any* development on the Paragon Property.

138. For example, one of these individuals desired to keep nearly eight acres of woodlands on the Paragon Property completely undeveloped.

139. Another individual opposed the Rolling Meadows development, falsely claiming that Rolling Meadows did not comply with the Comprehensive Plan.

140. Worse, certain Township residents took issue with the "type of development" and "type of new residents" Rolling Meadows would bring to the area.

141. For example, one community member questioned whether Rolling Meadows maintains the "value" of the community. Another stated that he did not want the "type of development" that Rolling Meadows would bring to Jerome Township.

142. Still another individual complained that Rolling Meadows does not "fit" in with the nearby larger properties.

143. Following the Trustees' approval of Rolling Meadows, a small group of organized members of the public circulated a petition, seeking a referendum to return Rolling Meadows to Rural Residential.

144. Referendum supporters criticized the Trustees for following the Ohio Revised Code's provisions for approving rezonings, claiming that the Township should find a way to deny the Rolling Meadows application even if it satisfies all requirements for approval.

145. Despite all of Paragon's efforts and its full compliance with the Comprehensive Plan and Zoning Resolution, the referendum received the requisite number of "no" votes to re-impose the Rural Residential zoning restrictions onto the Paragon Property.

146. Imposition of the Rural Residential zoning onto the Paragon Property was arbitrary, capricious, unreasonable, and does not bear a substantial relationship to the public health, safety, morals, or general welfare. Nor is it consistent with the Comprehensive Plan, which designates the Paragon Property as conservation development.

147. The continued imposition of the Rural Residential zoning and the delay caused by the sham referendum has resulted in and will continue to result in millions of dollars of damages to Paragon, Walbonns, and Mr. Haueisen.

### 3. The Farm at Indian Run

148. Tom Caldwell, on behalf of Wicked Chicken, applied to rezone land and sought approval of a preliminary development plan for the Farm at Indian Run. Yet again, despite fully complying with the Zoning Resolution and Comprehensive Plan, this small residential development was blocked altogether by a completely arbitrary and capricious referendum.

> **a. Mr. Caldwell Applies to Rezone the Caldwell Property to Develop the Farm at Indian Run, a Residential Development that Fully Complies with the Comprehensive Plan and Zoning Resolution.**

149. Mr. Caldwell, through Wicked Chicken, owns approximately 24 acres of land located along McKitrick Road just east of the McKitrick Road and Mitchell-Dewitt Road intersection that abuts an existing residential subdivision (the "Caldwell Property"):



150. Consistent with the vast majority of the Township, the Caldwell Property was zoned Rural Residential.

151. The Caldwell Property is to be rezoned to Residential Conservation District under the Comprehensive Plan – a Planned Development District. Comprehensive Plan p. 6-8.

152. The neighboring land contiguous to the Caldwell Property to the west, the Woods at Labrador subdivision, was rezoned to a Planned Development District prior to 2015.

153. Just as with the other Plaintiffs' developments, the Farm at Indian Run was designed to comply fully with the Zoning Resolution and Comprehensive Plan:



A true and accurate copy of the Illustrative Design for the Farm at Indian Run is attached as Exhibit 4.

154. The homes were intentionally clustered to preserve the existing natural features on the Caldwell Property, including a large pond, wetlands, a running stream, and many of the trees. More than 45% of the Caldwell Property is preserved as open space, an amount that far exceeds the 40% open space requirement.

155. Likewise, there are only 40 homes, or 1.66 dwelling units per acre, in the Farm at Indian Run. This low number of homes falls well short of the 2 dwelling units per acre permitted.

156. Here too, compliance with the Comprehensive Plan and Zoning Resolution was intentional. Mr. Smith was specifically retained to design the Farm at Indian Run, in part, because of his experience and role in creating the Township's Comprehensive Plan.

### b. It Is Infeasible to Develop the Caldwell Property Under the Rural Residential Zoning Restrictions.

157. The Caldwell Property presents several unique challenges to its development. Among other things, there is a large pond and stream that bisect the Caldwell Property, along with topographical changes that limit the economic feasibility of the property's development.

158. Mr. Caldwell introduced evidence during the rezoning hearings establishing that the Caldwell Property's Rural Residential zoning was unreasonable, unsafe, and uneconomical for several reasons and that the Planned Development District zoning would mitigate each of these issues.

159. First, developing the Caldwell Property as Rural Residential is unreasonable and unsafe in part because of the environmental dangers piecemeal development under Rural Residential zoning pose to the environment and surrounding properties. Constructing a centralized stormwater management system is not feasible for individual Rural Residential homes. Under a Rural Residential zoning, each parcel must attempt to manage stormwater on a lot-by-lot basis. Stormwater management is far less effective when built piecemeal when compared to a centralized system that can leverage more acreage to manage flood risks.

160. The Farm at Indian Run would therefore create a centralized system that better detains and controls the flow of stormwater. The increased density that comes with a Planned Development District makes a centralized stormwater management system (and sanitary sewer

and water systems) economically feasible.  Therefore, instead of several random and independent stormwater control efforts, the Farm at Indian Run would build a centralized stormwater control system to detain all of the onsite stormwater and manage stormwater flows through controlled releases to mitigate the risk of flooding on and environmental impacts upon the Caldwell Property and on adjacent properties.

161.    Second, if the Farm at Indian Run were developed as Rural Residential, there is no restriction against removing trees from land zoned Rural Residential.  *See* Zoning Resolution Chapter 425.  Mr. Caldwell, or any subsequent landowner, could simply clear cut the site to make way for long individual driveways to service narrow, flagstick lots.  The Farm at Indian Run, however, is specifically designed to preserve the majority of the trees on the Caldwell Property, along with its existing pond and stream, while maintaining nearly half of the entire Caldwell Property, or 45%, as undeveloped open space that conserves each of these unique natural features.

162.    Third, developing the Caldwell Property as Rural Residential would be unsafe due to traffic and safety issues caused by ingress and egress to the busy McKitrick Road to and from numerous individual drive ways.  Vehicles travel at high speeds along McKitrick Road.  Were the Caldwell Property to be developed as Rural Residential, each lot would have its own separate driveway to McKitrick Road.

163.    The Farm at Indian Run was designed to eliminate the congestion and traffic safety issues for vehicle travel on McKitrick Road by consolidating all residential drive access to a collector street.  Thus, there would be no individual driveways connecting to McKitrick Road.  Rather than having each resident back out of their separate driveways onto the busy McKitrick Road that are each impeded by sight obstructions such as mailboxes, trees, and bushes, the Farm at Indian Run was designed to provide every home in the subdivision access to McKitrick Road

through a much safer collector street. A traffic impact study confirmed that no roadway improvements were necessary to accommodate the residents at the Farm at Indian Run given the collector street access and low traffic volumes this small development would generate.

164. Additionally, the Caldwell Property's topography also presents unique challenges. There are grade changes, wetlands, a persistent stream, and a large pond. Consequently, housing must necessarily be clustered at an appropriate density to address each of these topographical challenges. While a development under Rural Residential zoning would require extensive and prohibitively expensive grading, the Farm at Indian Run clusters homes in order to preserve the existing topography without the need for such changes or cost-prohibitive grading.

### c. The Caldwell Property Is Rezoned and the Farm at Indian Run Is Approved.

165. Throughout the public review and approval of the Farm at Indian Run, Mr. Caldwell made every effort to meet with and address the legitimate concerns of the community.

166. For example, Mr. Caldwell held a meeting with residents who live in close proximity to the Caldwell Property to hear any concerns they had about the Farm at Indian Run Development. Mr. Caldwell invited at least 21 nearby landowners and all of the residents of the adjacent Woods at Labrador subdivision. Only six people attended.

167. On May 14, 2020, after a thorough review of the application and staff report, the LUC Zoning and Subdivision Committee unanimously recommended approval of the rezoning and preliminary development plan for the Farm at Indian Run.

168. Then on May 26, 2020 and June 22, 2020, the Zoning Commission held hearings to review the rezoning and preliminary development plan.

169. The Zoning Commission likewise recommended approval of the rezoning and preliminary development plan for the Farm at Indian Run.

170. Nevertheless, individuals opposed the Farm at Indian Run for unfounded and illegitimate reasons that have no bearing on the Township's zoning authority.

171. For example, one of the individuals complained that the "character" of the street would somehow be destroyed by the Farm at Indian Run.

172. A neighboring property owner, conceded that the Farm at Indian Run complied with the Comprehensive Plan and zoning regulations, but complained that the rezoning should nonetheless be rejected because the Farm at Indian Run would destroy the area through "urbanization."

173. Of course, the Farm at Indian Run will not change the "character" of Jerome Township, the development embodies the Township's Comprehensive Plan. Likewise, the contention that 40 new single family homes could "urbanize" the area is completely arbitrary and unfounded.

174. On August 18, 2020, the Trustees approved rezoning the Caldwell Property to Planned Development and the preliminary development plan for the Farm at Indian Run. The lone dissenting vote, Trustee Megan Sloat said during the hearing that she opposed the destruction of certain trees on the Caldwell Property. The Township Zoning Inspector correctly responded that under the existing Rural Residential zoning, the entire property could be clear cut because the Township does not regulate the removal of trees from properties zoned Rural Residential.

175. Wicked Chicken spent significant sums securing the land for the Farm at Indian Run, planning and designing the development, and applying for and obtaining approvals from the Township's Zoning Commission, the LUC Zoning & Subdivision Committee, and the Township Trustees.

### d. The Farm at Indian Run Is Blocked By Another Referendum.

176. Soon after the Trustees approval, a referendum against the Farm at Indian Run was

initiated.

177.    The referendum had no basis on whether the Farm at Indian Run complied with the Township's Comprehensive Plan or in any legitimate health or safety concerns.

178.    Instead, the vocal minority of individuals in the Township sought to "slow the development in Jerome Township" to "help preserve our rural character."

179.    A smear campaign disparaging Mr. Caldwell and his Wicked Chicken company ensued.

180.    For example, one community member posted on social media that "you have the cowards at Jerome Twp approving every single build permit for some postage stamp lot with cheaply build [*sic*] 'mcmansion' meanwhile they can't even take care of the existing residents in the rural areas.  I hope The Chicken gets his cluck, and buy my 10 acre place for top dollar.  Sick of living out here."

181.    Without any reference to the fact that the development complied with applicable density limits, proponents falsely claimed that:  "Builders are being GREEDY by trying to cram in as many homes as possible without a thought to their impact."

182.    A community member even accused Mr. Caldwell of fraud, claiming that Mr. Caldwell somehow lied about how Mr. Caldwell planned to use the Caldwell Property.

183.    In May 2021, the referendum received the requisite number of "no" votes, which imposed the Rural Residential zoning restrictions back onto the Caldwell Property.

184.    Just a couple of days after the referendum, the true motivation behind the neighbors' self-interested opposition to the rezoning was laid bare.  The neighbors who led the opposition to the rezoning sought to buy a significant portion of the Caldwell Property for their own use.  On May 10, 2021, one of the neighbors wrote to Mr. Caldwell, attempting to purchase

a third of the Caldwell property given that Mr. Caldwell could do nothing with his land as a result of the referendum:

> I would be interested in buying 7-8 acres of your land that lies along mine and Mr. Deanes [*sic*] property line. . . . I have no idea as to what your development plans are now but maybe a little less land would work out better for you?

185. Foisting the Rural Residential zoning onto the Caldwell Property was arbitrary, capricious, unreasonable, and bears no relationship to the public health, safety, morals, or general welfare of the Township. Nor is it consistent with the Comprehensive Plan, which designates the Caldwell Property as conservation development.

186. The continued imposition of the Rural Residential zoning and the delay caused by the sham referendum has resulted in and will continue to result in millions of dollars in damages to Wicked Chicken.

**F.    The Unconstitutional Scheme to Prevent *Any* Development Within the Township Does Not Stop with Plaintiffs' Properties.**

187. The organized and vocal group of individuals have continued their unconstitutional scheme to block all development within the Township.

188. Another developer, Jerome Village Company, LLC ("JVC"), also sought to rezone its property (the "Fry Property") to Planned Development District and sought approval of its development plan for the Fry Property (the "JVC Fry Development"). Notably, JVC is also the developer responsible for Jerome Village, a community that is touted in the Comprehensive Plan as the model residential community for the Township.

189. The Fry Property, comprising of approximately 163 acres of undeveloped land located generally on the northwesterly side of U.S. Highway 42 between Harriot Road and Wells Road. The Fry Property was zoned Rural Residential. However, for the reasons set forth in the

Township's Comprehensive Plan, the Fry Property is no longer suitable for rural, agricultural use.

190.    Additionally, under Rural Residential Zoning, the Fry Property generates extremely low property taxes through the Current Agricultural Use Valuation ("CAUV") program. This CAUV designation results in substantially low property taxes. Moreover, developing the Fry Property under the Rural Residential zoning restrictions poses significant traffic and safety issues. If the Fry Property were developed under Rural Residential zoning, it would require multiple driveways onto U.S. 42 that would cause traffic congestion and safety issues.

191.    Whereas developing the Fry Property as a Planned Development District ameliorates the issues caused by the Rural Residential zoning and provides numerous benefits to the Township. For example, the configuration of the JVC Fry Development respects the unique characteristics and natural quality of the site and the immediate vicinity, and protects the community's natural resources by avoiding destruction of sensitive environmental areas. It also follows the configuration set forth in the Comprehensive Plan, such that the different uses are blended appropriately to provide extensive green space and open space. Additionally, the JVC Fry Development is designed to provide adequate drainage without substantial impact to potentially sensitive environmental features.

192.    JVC applied to develop the JVC Fry Development, containing commercial outparcels, a single family home subdivision and condominium and patio home developments. The proposed development plan for the JVC Fry Development is fully consistent with the Zoning Resolution and the Comprehensive Plan.

193.    JVC also made substantial commitments to the community as a part of the approval of the JVC Fry Development, including committing approximately $2.5 million in road improvements in the Township; widening the U.S. 42 roadway, adding turn lanes, installing a

controlled light system to an intersection, and adding a crosswalk; and making a nearly $400,000 direct payment to the Township for utility access and community fees to fund public services.

194.     Nevertheless, the small group of organized individuals arbitrarily opposed the JVC Fry Development.  For example, one individual argued that the rezoning should be denied because of the "kind of clientele it draws. . . [being] on the lower end of the housing market."

195.     Because the JVC Fry Development is consistent with both the Comprehensive Plan and the Zoning Resolution, the LUC Zoning and Subdivision Committee, the Zoning Commission, and the Trustees approved JVC's application.

196.     Shortly thereafter, a referendum petition was filed on April 14, 2021, seeking to reverse the approved rezoning.  But for the Union County Board of Elections' decertification of the referendum petition on July 22, 2021, JVC would be in the same position as Plaintiffs.  The JVC Fry Development was delayed more than three months as a result of the referendum petition attempt.

197.     Moreover, the Township will inevitably delay yet another residential rezoning soon.  JVC also recently applied to rezone and sought approval of a development plan for additional housing within Jerome Village.

198.     JVC applied to rezone three parcels of land totaling approximately 69 acres that are located on the south side of Blaney Road, south of Harriott Road, north of Wells Road and east of Jerome Road ("VN-10 Property").

199.     JVC seeks to rezone the VN-10 Property from Rural Residential to a Planned Development District to build a residential subdivision as part of Jerome Village ("Village Neighborhood 10 Development").

200.      The rezoning of the VN-10 Property and development plan for the Village

Neighborhood 10 Development are entirely consistent with the Comprehensive Plan and Zoning Resolution. The Trustees approved the rezoning on July 6, 2021.

201. Within days of the Trustees' approval and disregarding the development's full compliance with the Comprehensive Plan and Zoning Resolution, individuals in the Township are already actively circulating a referendum petition to block the rezoning of the VN-10 Property.

202. Despite lacking any merit under Ohio zoning law and the Township's zoning authority, unlike similar rezonings previously approved by the Township, each and every residential rezoning is now being subjected to status quo zoning that is illegal, arbitrary, and capricious. In each such instance, the landowners and developers are subjected to inevitable delays causing them to incur significant ongoing harm.

### COUNT I: 42 U.S.C. Section 1983
### Violation of Substantive Due Process

203. Plaintiffs restate the foregoing paragraphs as if fully rewritten here.

204. Jerome Township has deprived Plaintiffs of their property and liberty interests under color of law without due process of law in violation of the Due Process Clause in the United States Constitution.

205. Plaintiffs' property and liberty interests are of a type protected by the Fourteenth Amendment to the United States Constitution.

206. Plaintiffs possess legitimate claims of entitlement and justifiable expectations in their property and liberty interests, for among other reasons:

       i. Jerome Township's current zoning of Plaintiffs' properties is not in accordance with Jerome Township's Comprehensive Plan and is not in the interest of the public health and safety;

      ii. Plaintiffs' rezoning applications are in accordance with Jerome Township's

Comprehensive Plan and are in the interest of the public health and safety, such that Jerome Township did not have discretion to deny Plaintiffs' rezoning applications;

iii.   Plaintiffs undertook significant actions and made substantial investments in their properties such that Jerome Township's restoration of the Rural Residential zoning classification – an arbitrary departure from the Comprehensive Plan and the interests of the public health and safety – would cause substantial detriment to the Plaintiffs; and

iv.   Plaintiffs expended significant sums to design and plan the Homestead at Scotts Farm, Rolling Meadows, and The Farm at Indian Run.

207.   The efforts to apply the referendum process to restore the Rural Residential zoning classification to the Plaintiffs' properties and to delay and ultimately block any development of Plaintiffs' properties are arbitrary, capricious, unreasonable, and do not bear a substantial relationship to Jerome Township's Comprehensive Plan or the public health and safety.

208.   The referendum results, where Jerome Township restored the Rural Residential zoning classification to the Plaintiffs' properties, are arbitrary, capricious, unreasonable, and do not bear a substantial relationship to Jerome Township's Comprehensive Plan or the public health and safety.

209.   Accordingly, Plaintiffs have suffered and will continue to suffer the deprivation of their vested rights under the United States Constitution.

### COUNT II:  42 U.S.C. Section 1983
### Violation of Equal Protection

210.   Plaintiffs restate the foregoing paragraphs as if fully rewritten here.

211.   Jerome Township has subjected Plaintiffs to unequal treatment of the law under

color of law in violation of the Equal Protection clause of the Fourteenth Amendment to the United States Constitution.

212.    Previously, Jerome Township has rezoned numerous other properties that, similar to Plaintiffs, sought to rezone from the Rural Residential zoning classification to the Planned Development District zoning classification, including for developments that deviated from the Comprehensive Plan.

213.    Plaintiffs' rezoning applications were either as compliant, or more compliant, with the Comprehensive Plan and all legitimate zoning standards set by Jerome Township and in the interest of public health and safety than the applications that received rezoning from Jerome Township in the past.

214.    The Township treated Plaintiffs differently than the other similarly situated applicants who applied for and received rezoning from Rural Residential to Planned Development District zoning in that:

   i.    The Township arbitrarily and unreasonably instituted the referendum process for improper purposes in an effort to delay any development of the Plaintiffs' properties;

   ii.   The referendum result arbitrarily and unreasonably restored the Paragon Property to Rural Residential zoning; and

   iii.  The referendum result arbitrarily and unreasonably restored the Caldwell Property to Rural Residential zoning.

215.    Jerome Township acted with animus and has no rational basis for the discriminatory treatment of the Plaintiffs.

216.    Accordingly, Plaintiffs have suffered and will continue to suffer from Jerome

Township's unequal treatment of the law.

## COUNT III: Declaratory Judgment
## The Scott Property / Homestead at Scotts Farm

217.    Plaintiffs restate the foregoing paragraphs as if fully rewritten here.

218.    The Rural Residential designation as applied to the Scott Property is unconstitutional, unreasonable, inconsistent with the Comprehensive Plan, and not substantially related to the public health or safety.

219.    Therefore, Pulte, T-Bill, and the Scott Family are entitled to a declaration that subjecting the Scott Property to the Rural Residential zoning classification is unconstitutional, unreasonable, inconsistent with the Comprehensive Plan, and not substantially related to the public health or safety.

220.    The rezoning of the Scott Property to the Planned Development District as set forth in the rezoning application is constitutional, reasonable, substantially related to the public health and safety, and consistent with the Comprehensive Plan.

221.    Therefore, Pulte, T-Bill, and the Scott Family are entitled to a declaration that rezoning the Scott Property to the Planned Development District and approving the Homestead at Scotts Farm development is constitutional, reasonable, substantially related to the public health and safety, and consistent with the Comprehensive Plan.

## COUNT IV: Declaratory Judgment
## Paragon Property / Rolling Meadows

222.    Plaintiffs restate the foregoing paragraphs as if fully rewritten here.

223.    The Rural Residential zoning classification as applied to the Paragon Property is unconstitutional, unreasonable, not substantially related to the public health or safety, and not consistent with the Comprehensive Plan.

224.     Therefore, Paragon, Walbonns, and Mr. Haueisen are entitled to a declaration that subjecting the Paragon Property to the Rural Residential zoning classification is unconstitutional, unreasonable, not substantially related to the public health or safety, and not consistent with the Comprehensive Plan.

225.     The rezoning of the Paragon Property to a Planned Development District as set forth in Paragon's rezoning application is constitutional, reasonable, substantially related to the public health and safety, and consistent with the Comprehensive Plan.

226.     Therefore, Paragon, Walbonns, and Mr. Haueisen are entitled to a declaration that rezoning the Paragon Property to the Planned Development District and approving the Rolling Meadows development is constitutional, reasonable, substantially related to the public health and safety, and consistent with the Comprehensive Plan.

<u>**COUNT V:  Declaratory Judgment**</u>
<u>**The Caldwell Property / The Farm at Indian Run**</u>

227.     Plaintiffs restate the foregoing paragraphs as if fully rewritten here.

228.     The Rural Residential zoning classification as applied to the Caldwell Property is unconstitutional, unreasonable, not substantially related to the public health or safety, and not consistent with the Comprehensive Plan.

229.     Therefore, Wicked Chicken is entitled to a declaration that subjecting the Caldwell Property to the Rural Residential zoning classification is unconstitutional, unreasonable, not substantially related to the public health or safety, and not consistent with the Comprehensive Plan.

230.     The rezoning of the Caldwell Property to the Planned Development District zoning as set forth in Wicked Chicken's rezoning application is constitutional, reasonable, substantially related to the public health and safety, and consistent with the Comprehensive Plan.

231.     Therefore, Wicked Chicken is entitled to a declaration that rezoning the Caldwell

Property to the Planned Development District and approving the Farm at Indian Run development is constitutional, reasonable, substantially related to the public health and safety, and consistent with the Comprehensive Plan.

### COUNT VI: 42 U.S.C. Section 1983
### In the Alternative, Regulatory Taking

232. Plaintiffs restate the foregoing paragraphs as if fully rewritten here.

233. Jerome Township's imposition of the Rural Residential zoning classification on Plaintiffs' properties – and failure to remove the Rural Residential zoning classification – interferes with Plaintiffs' investment-backed expectations and results in severe detrimental economic impacts to the Plaintiffs.

234. Jerome Township's imposition of the Rural Residential zoning classification as applied to Plaintiffs' properties is functionally equivalent to a direct appropriation of the properties and therefore constitutes a regulatory taking.

235. Jerome Township has not provided Plaintiffs just compensation for their properties.

236. Accordingly, Plaintiffs have suffered and will continue to suffer the taking of their property without just compensation in violation of the Fifth Amendment the United States Constitution.

### COUNT VII: 42 U.S.C. Section 1983
### Due Process Taking

237. Plaintiffs restate the foregoing paragraphs as if fully rewritten here.

238. Jerome Township has deprived Plaintiffs of their property and liberty interests under color of law without due process of law in violation of the Due Process Clause in the United States Constitution.

239. Plaintiffs' property and liberty interests are of a type protected by the Fourteenth

Amendment to the United States Constitution.

240.    Jerome Township's imposition of the Rural Residential zoning classification to Plaintiffs' properties – and failure to remove the Rural Residential zoning classification – goes so far and destroys the value of Plaintiffs' property to such an extent that it has the same effect as a taking by eminent domain.  This imposition is an invalid exercise of the police power.

241.    Jerome Township's denial of Plaintiffs' re-zoning applications through referendum goes so far and destroys the value of Plaintiffs' property to such an extent that it has the same effect as a taking by eminent domain.  This imposition is an invalid exercise of the police power.

242.    Plaintiffs have suffered monetary damages as a result of Jerome Township's invalid exercise of the police power and Jerome Township's application of the Rural Residential zoning classification to Plaintiffs' properties must be invalidated.

## PRAYER FOR RELIEF

**WHEREFORE**, in consideration of the foregoing, Plaintiffs seek:

A. A declaration that subjecting the Scott Property to the Rural Residential zoning classification is unconstitutional, unreasonable, not substantially related to the public health or safety, and not consistent with the Comprehensive Plan.

B. A declaration that rezoning the Scott Property to the Planned Development District and approving the Homestead at Scotts Farm development is constitutional, reasonable, substantially related to the public health and safety, and consistent with the Comprehensive Plan.

C. A declaration that subjecting the Paragon Property to the Rural Residential zoning classification is unconstitutional, unreasonable, not substantially related to the public health or safety, and not consistent with the Comprehensive Plan.

D. A declaration that rezoning the Paragon Property to the Planned Development District and approving the Rolling Meadows development is constitutional, reasonable, substantially related to the public health and safety, and consistent with the Comprehensive Plan.

E. A declaration that subjecting the Caldwell Property to the Rural Residential zoning classification is unconstitutional, unreasonable, not substantially related to the public health or safety, and not consistent with the Comprehensive Plan.

F. A declaration that rezoning the Caldwell Property to the Planned Development District and approving the Farm at Indian Run development is constitutional, reasonable, substantially related to the public health and safety, and consistent with the Comprehensive Plan.

G. A permanent injunction enjoining the Township from applying the Rural Residential zoning classification to Plaintiffs' properties;

H. A permanent injunction enjoining the Township from preventing Plaintiffs from completing the development of Plaintiffs' properties as planned residential communities as previously approved by the Township;

I. Compensatory damages;

J. Attorneys' fees and costs pursuant to 42 U.S.C. Section 1988; and

K. Any other declarative, injunctive, or other equitable relief this Court deems just and appropriate.

Respectfully submitted,

*s/ Joseph R. Miller*
Joseph R. Miller (0068463), Trial Attorney
Christopher L. Ingram (0086325)
Elizabeth S. Alexander (0096401)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6233  Fax: (614) 719-4630
jrmiller@vorys.com
clingram@vorys.com
esalexander@vorys.com

Counsel for Plaintiffs

## JURY DEMAND

Plaintiffs request a trial by jury on all issues so triable.

Respectfully submitted,

*s/ Joseph R. Miller*
Joseph R. Miller (0068463), Trial Attorney
Christopher L. Ingram (0086325)
Elizabeth S. Alexander (0096401)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6233  Fax: (614) 719-4630
jrmiller@vorys.com
clingram@vorys.com
esalexander@vorys.com

Counsel for Plaintiffs